STATE OF CONNECTICUT *v.* JAMES W.*
(AC 24396)

Foti, Flynn and Hennessy, Js.

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom her identity may be ascertained. See General Statutes § 54-86e.

Argued November 18, 2004—officially released February 15, 2005

*William F. Gallagher*, with whom, on the brief, were *Hugh D. Hughes*, *Mark A. Balaban* and *Lawrence S. Hopkins*, for the appellant (defendant).

*Joseph T. Corradino*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Bene-*

*dict*, state's attorney, and *Cornelius P. Kelly*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, James W., appeals from the judgment of conviction, following a jury trial, of risk of injury to a child in violation of General Statutes § 53-21 (2).[1] The defendant claims that the court improperly permitted the state to elicit certain testimony from an expert witness. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. The victim turned three years old in April, 2002. Her parents often took her to the home of the defendant, her paternal grandfather. The victim's parents did not leave the victim unaccompanied with the defendant or his wife, who also lived at the home, but the victim and the defendant did spend time alone together during the visits. During one of these visits in May or June, 2002, the defendant touched the victim's intimate parts.[2]

In addition to eliciting testimony from other witnesses at trial, the state elicited testimony from Lisa Radigan, a licensed clinical social worker. Radigan testified concerning her educational background in social work, as well as her professional experience providing mental health treatment to children, adolescents and adults. As part of her experience, Radigan has either

[1] The court sentenced the defendant to a term of incarceration of ten years, execution suspended after five years, to be followed by fifteen years of probation. The court also ordered the defendant to register as a sexual offender for a period of ten years. The court granted the defendant's motion for a judgment of acquittal with regard to the crime of sexual assault in the first degree.

[2] General Statutes § 53a-65 (8) defines "intimate parts" as "the genital area, groin, anus, inner thighs, buttocks or breasts." On the basis of the evidence, the jury reasonably could have concluded that the defendant touched the victim's genital area.

supervised or conducted numerous interviews of children, some as young as three years of age, in child sexual abuse cases. According to Radigan, many of those children were referred to her by police departments or the department of children and families (department). In her capacity supervising interviews, Radigan has worked with department employees, law enforcement personnel, victim's advocates and interviewers. Radigan has evaluated children concerning sexual abuse in her employment at mental health treatment centers concerning sexual abuse, as well as at hospital affiliated sexual abuse clinics. Radigan also has trained medical students, police officers and department workers in the subject of child sexual abuse.

Radigan testified concerning the process of conducting forensic interviews of children as it relates to sexual abuse and discussed certain behavior generally exhibited by child sexual abuse victims. Radigan testified that she was familiar with the victim in the present case and the interview process that she underwent. The defendant challenges the admissibility of two aspects of Radigan's testimony, which, he argues, constituted improper expert opinion with regard to credibility. First, the defendant argues that the court improperly permitted Radigan to testify regarding the subject of delayed disclosure of abuse by child sexual abuse victims. Second, the defendant argues that the court improperly permitted Radigan to testify with regard to the subject of coaching, as it pertains to allegations of child sexual abuse. We will set forth our standard of review and address each of the claims in turn.

"[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed." (Internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 123, 763 A.2d 1 (2000).

"A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue." Conn. Code Evid. § 7-2.

I

The defendant first claims that the court improperly permitted the state to elicit testimony from Radigan regarding the subject of delayed reporting of abuse by minor sexual abuse victims. Before Radigan testified, the defendant asked the court to preclude the state from eliciting expert testimony from Radigan concerning two subjects upon which the state indicated she would testify: delayed disclosure of abuse by minor sexual abuse victims and coaching. The defendant argued, with regard to testimony concerning delayed disclosure, that such testimony was not relevant in this case. The state argued that the evidence demonstrated that the victim had not disclosed the abuse to anyone immediately after it allegedly had occurred and that expert testimony from Radigan as to the general behavior patterns of minor sexual abuse victims was relevant to understanding why this might have occurred. The state argued that the law permitted such testimony and that Radigan would not testify with regard to the credibility of the victim. The court permitted the testimony.

Radigan testified as follows with regard to the issue of delayed disclosure during the state's direct examination:

"Q. Now in your experience, training and education, Ms. Radigan, do children in the age range of three to four years have difficulty concerning temporal concepts, timing?

"A. Yeah. Kids actually don't master things like dates and times usually until about age seven. But preschool children particularly have a really difficult time kind of being able to articulate exactly when something happened. They just developmentally don't have the concepts to articulate those types of things.

"Q. And have you ever heard the term late disclosure?

"A. Yes.

"Q. And what does that mean?

"A. A late or delayed disclosure basically means that a child doesn't tell right away after they've been touched, which is actually more common than not in cases of sexual abuse.

"Q. And why is that?

"A. Lots of factors. Sometimes kids are threatened or told not to tell, lots of kids don't really understand what's happened to them, and they, especially young kids, don't have the articulation to explain to someone what's happened. Embarrassment, shame, kids often feel responsible because their parents tell them, you know, no one is supposed to touch you in your privates, and then when that happens, a lot of times kids will take responsibility that perhaps sometimes it's their fault. Kids generally don't report things when they think it's their fault.

"Q. Now the children at the age of three to four, do they understand their sexual organs or what they're for, other than perhaps the basic sanitary needs?

"A. Yeah, I mean, kids generally associate genitalia with, you know, being able to go to the bathroom.

"Q. All right. Does the relationship between the offender and the victim in any way play a part in that

delayed disclosure that you were speaking about before?

"A. Sure. I mean, it certainly complicates it, you know. As you can imagine, you know, if somebody that you have positive feelings about or have a close relationship violates you in a certain way, it makes it much more complicated and makes it much more difficult to tell. Lots of times kids, again, take the responsibility. They're afraid if they tell their mother or tell their father that the father is going to get upset or worried or things like that."

The victim, who was three years old at the time of trial, testified on direct examination that she thought she told her parents "right away" that the defendant had touched her "privates." During cross-examination, the defendant's attorney asked the victim several questions related to the timing of her disclosure. For example, he asked the victim if she remembered "when" she spoke with her parents about the alleged incident and if she had discussed the incident "recently." The victim replied that she did not remember when she talked with her parents about the incident. The defendant's attorney pursued the line of inquiry, asking the victim if she remembered telling her mother about the incident. The victim replied affirmatively. The defendant's attorney asked the victim where the disclosure had occurred, whether it had taken place at the defendant's house (where the incident allegedly had occurred) and whether the disclosure had occurred on the same day that the incident allegedly occurred. The victim gave contradictory answers to the questions. She testified, on the one hand, that she told her mother about the incident on the same day that it had occurred at the defendant's house and, on the other hand, that she did not recall where she was when she told her mother about the incident. The defendant's attorney also inquired whether the victim had visited a physician

"near the time" that the defendant had touched her. The victim replied that she had not.

The victim's mother testified that she and her husband took the victim to the defendant's house frequently for visits, and that visits occurred in May and June, 2002. The victim's mother testified that the victim told her about the incident on June 25, 2002, while she was driving the victim to her day care provider. According to the victim's mother, she was discussing "good touch and bad touch" with the victim when the victim indicated where the defendant had touched her by rubbing her "vaginal area."

During cross-examination, the defendant's attorney asked the victim's mother about her testimony that the victim related more details about the incident to her after the initial disclosure. The victim's mother testified that, within a week after the victim told her about the incident, the victim told her that the incident had occurred in the defendant's backyard. The defendant's attorney asked the victim's mother questions related to the timing and circumstances of this further disclosure by the victim.

The defendant argues that "[t]he defense never impeached the credibility of the victim regarding delayed reporting" and that "Radigan's testimony regarding delayed reporting therefore did not rebut or refute any insinuation by the defendant, but rather served only to bolster the credibility of the victim." The defendant asserts: "In the absence of impeachment on this subject, the extensive expert testimony about delayed reporting served one purpose: to comment on the credibility of the victim."

This court addressed a similar issue in *State* v. *Cardany*, 35 Conn. App. 728, 730–32, 646 A.2d 291, cert. denied, 231 Conn. 942, 653 A.2d 823 (1994), another appeal from a conviction on charges related to the sex-

ual abuse of a minor victim.[3] There, one of the issues raised was whether the trial court properly had admitted expert testimony "that it is not unusual for abuse victims to delay in reporting incidents of abuse." Id., 730. The defendant claimed that the expert testimony was inadmissible because he "had not initially impeached the victim's credibility on the issue of delay." Id. This court held that "the state may introduce expert testimony that explains in general terms the tendency of minors to delay in reporting incidents of abuse once the victim has testified and there has been testimony introducing the alleged dates of abuse and reporting." Id., 731. "The rationale for allowing testimony in the state's case-in-chief to explain alleged delays in reporting incidents of abuse is analogous to the rationale for allowing constancy of accusation testimony, with or without actual impeachment." Id. This court further explained that "[i]t is natural for a jury to discount the credibility of a victim who did not immediately report alleged incidents of abuse whether or not the defense emphasizes the delay in cross-examination. Thus, testimony that explains to the jury why a minor victim of sexual abuse might delay in reporting the incidents of abuse should be allowed as part of the state's case-in-chief." Id., 732. This court upheld the admission of expert testimony concerning the subject of delayed disclosure by minor victims of sexual abuse in *Cardany*, and there is no dearth of authority upholding the admissibility of such evidence. See, e.g., *State v. Francis D.*, 75 Conn. App. 1, 14–16, 815 A.2d 191, cert. denied, 263 Conn. 909, 819 A.2d 842 (2003); *State v. Thompson*, 71 Conn. App. 8, 17–23, 799 A.2d 1126 (2002); *State v. Christiano*, 29 Conn. App. 642, 649–54, 617 A.2d 470 (1992), aff'd, 228 Conn. 456, 637 A.2d 382,

---

[3] The defendant in *Cardany* was convicted of one count of sexual assault in the first degree and two counts of risk of injury to a child. *State v. Cardany*, supra, 35 Conn. App. 729.

cert. denied, 513 U.S. 821, 115 S. Ct. 83, 130 L. Ed. 2d 36 (1994).

The defendant's claim that Radigan's testimony with regard to delayed disclosure was inadmissible because he did not attempt to impeach the victim's credibility on the basis of delayed disclosure is belied by the transcript of proceedings at trial. The record reflects that the defendant's attorney did, in fact, question the victim and her mother concerning the timing of the victim's initial disclosure of abuse, as well as the timing of the victim's later disclosure of additional information about the abuse. Whether the defendant's inquiries constituted an impeachment of the victim's credibility, however, is not dispositive. Our law is clear that impeachment is not a necessary predicate for the introduction of this expert testimony; all that is required is that evidence concerning the timing of the alleged abuse and disclosure be placed before the finder of fact.[4] That occurred in this case, and the court properly permitted the state to elicit Radigan's testimony during its case-in-chief. Here, the expert testimony was admissible, and did not impermissibly bolster the victim's credibility, because it explained, in general terms, the behavioral characteristics of minor sexual abuse victims with regard to the issue of delayed disclosure of abuse. Accordingly, we conclude that the court did not abuse its discretion by permitting the state to present this evidence to the jury.

II

The defendant finally claims that the court improperly permitted Radigan to testify with regard to the subject of coaching, as it pertains to child sexual abuse victims. As we noted in the context of our discussion

---

[4] On the basis of the evidence presented, it was reasonable to conclude that the victim did not disclose the alleged abuse immediately following the time of its alleged occurrence.

in part I, the defendant asked the court to preclude Radigan from testifying with regard to the subject of coaching. The defendant argued, essentially, that Radigan's expert testimony was unnecessary because the jury did not need any assistance in evaluating the victim's credibility and that any expert testimony concerning general behavior exhibited by minor sexual abuse victims would encroach upon the jury's evaluation of the victim's credibility. The prosecutor argued that Radigan's testimony with regard to the general behavioral characteristics of minor victims of sexual abuse and, specifically, the issue of coaching,[5] was relevant and admissible because the defendant's attorney, in his cross-examinations of the victim and other witnesses had, at the least, implied that the victim had been coached to allege abuse. As he did with regard to expert testimony concerning delayed disclosure, the prosecutor argued that testimony concerning coaching would assist the jury in evaluating the victim's testimony. The court agreed with the state, noting that, in light of the alleged victim's age and the allegations of abuse, the testimony would be helpful to the jury. The court also indicated that it believed that the defendant's attorney, during cross-examination, had attempted to demonstrate that the victim had been coached.

The prosecutor, thereafter, elicited testimony from Radigan with regard to the subject of coaching. The following colloquy occurred during the state's case-in-chief:

"Q. Now in your experience . . . coaching of children, is that a concern in forensic interviews?

"A. Sure, it's always a concern. I think a good forensic interviewer, a good supervisor, goes into an interview

[5] The prosecutor indicated that he intended to elicit testimony from Radigan concerning the "signs" that tend to indicate that a child has been coached.

and thinks, okay, what are all the other possibilities of why this child would be saying it other than sexual abuse? And you kind of systematically rule those possibilities out until you come to the conclusion that, you know, why else would the child be saying this? Coaching is always something that we're concerned about and are always looking for.

"Q. Now, in your experience, your training and education, and some of the literature that exists out there with respect to coaching, are there any particular signs that you look for that the child may exhibit [if] coaching is suspected?

"A. Sure. And again, this is, you know, this is general. Often kids who are coached tend to blurt out their statement right away, you know, because they've kind of been programmed that this is what they need to say, so they'll say it right away. They kind of don't participate through an engagement period during the interview. Kids sometimes will have pretty limited statements around the abuse, you know, they'll make vague statements. They often can't talk about sensory details. What did it feel like? What did it look like? What did it smell like? Things like that. In general, parents who are coaching their child are usually very involved in the process, you know, sometimes [they] don't want to separate from the child. Sometimes parents will insist on being in the room with the child being interviewed and will appear, for lack of a better word, overintense in the process, kind of wanting to know a lot of details. Well, what exactly did the child say? Things like that.

"Q. Now, in this particular case with [the victim], did you have an opportunity to meet with the parents when the interview was conducted?

"A. Yes, I did.

"Q. Okay. And was there a separation, meaning was [the victim] interviewed in a room other than a room that her parents were in?

"A. Yes. The parents were not present.

"Q. All right. And with respect to [the victim] separating from her parents, do you recall whether or not the parents, after the interview, were overly enthusiastic about any of the information that you had given to them—that you may have given to them?

"A. No. I mean, they were appropriately concerned. They certainly wanted to know what our impressions were and they were certainly interested in what their child disclosed.

"Q. Okay.

"A. They were actually more concerned about treatment and recovery for their daughter than actually the content of the disclosure."

The defendant claims on appeal, as he did at trial, that the court should have precluded the testimony because he did not attempt to impeach the victim's credibility by suggesting that she had been coached. The defendant also claims that, even if he had sought to impeach the victim's credibility in this manner, Radigan's testimony impermissibly bolstered the victim's credibility.

Our review of the record supports the observations of the prosecutor and the court that the defendant had attempted to impeach the victim's credibility by demonstrating that she had been coached by her mother. The defendant pursued this line of inquiry in his cross-examination of the victim. First, the defendant cross-examined the victim concerning conversations that she had had with her mother, before she alleged abuse, related

to the issue of sexual abuse.[6] Second, the defendant, over objection by the state, cross-examined the victim about statements she made to her day care provider at or around the time that she reported the abuse to her mother. Specifically, the defendant's attorney asked the victim if she made certain statements about experiencing pain in her genitals because her mother told her to do so.[7] Finally, the defendant's attorney asked the victim

---

[6] The defendant's attorney questioned the victim as follows:

"Q. All right. Do you remember talking to your mom about people touching your privates?

"A. No.

"Q. Did your mom tell you before you would go to school that you shouldn't let people touch your privates?

"A. I don't know.

"Q. You don't remember?

"A. No.

"Q. Okay. Did you ever have any talks with your mom about bad touching before—you don't recall ever having those [kinds] of talks with your mom?

"A. No.

"Q. All right. Do you remember whether or not your mom ever told you not to let people touch you in a bad way?

"A. No.

"Q. Is it that you don't remember talking to your mom about that or you never talked to her about that?

"A. I don't know.

"Q. Okay. Did your mom ever tell you that she had been touched in a bad way?

"A. I don't know.

"Q. You don't remember?

"A. No.

"Q. And you never remember her telling you not to let people touch you in a bad way?"

[7] The prosecutor objected to the defendant's attempt to cross-examine the victim with regard to statements that she made to her day care provider several days before she reported the abuse to her mother. Outside of the presence of the jury, the defendant's attorney indicated that the victim's day care provider noted, in written form, that, on June 20, 2002, the victim told her that her "privates" were going to hurt. The provider further noted that, when she asked the victim why this was the case, the victim told her that "her mother told her that they were going to hurt." The defendant's attorney justified his line of inquiry as follows: "So, because [the victim's statement to her day care provider is] so contemporaneous with the very complaint, I want to know whether the mother, for some reason, is trying to influence her to make a complaint of vaginal irritation on the very day [the victim] was supposed to have complained of this to the mother. It

if she had rehearsed her present testimony with her mother.

At trial, the victim's mother testified that the victim disclosed the abuse to her while she was driving the victim to her day care provider and that the disclosure occurred at or near a time at which she had discussed the topic of sexual abuse with the victim. The victim's mother testified that, from the time that her daughter was two years old, she routinely discussed the issue of "good touch and bad touch" with her so as to educate her daughter about the subject and to let her know that it was "okay to tell the truth in case something bad did happen." The victim's mother testified that she did not discuss with the victim the subject of her testimony in court, tell her anything about coming to court to testify or "prepare" her for testifying.

The defendant also pursued lines of inquiry related to coaching in his cross-examination of the victim's mother. First, the defendant's attorney cross-examined the victim's mother concerning her relationship with the defendant, her husband's father. The defendant's attorney specifically inquired as to financial disagreements between the victim's mother and the defendant, disagreements that purportedly arose just prior to the

---

seems it goes very seriously to the issue of bias, motive [and] manipulation under the circumstances for some reason that, even without anything else, would seem extremely important under the circumstances."

The court permitted the inquiry. The defendant's attorney questioned the victim as follows:

"Q. [D]o you remember ever complaining to any of your teachers, telling them that your privates were going to hurt you?

"A. No.

"Q. All right. Do you remember ever telling your teachers that your mother told you to tell them that your privates were going to hurt you?

"A. I don't know.

"Q. All right. You don't remember? Is that what you mean? All right. Did your mommy ever tell you to tell your teachers that your privates would hurt?"

victim's allegation of abuse.[8] By means of this inquiry, the defendant could have intended to demonstrate only that the victim's mother had a motive to cause her daughter to allege the abuse because of her own disagreements with the defendant. Second, the defendant's attorney extensively cross-examined the victim's mother about her practice of talking frequently with the victim about the subject of sexual abuse and her own history of sexual abuse as a child.[9] These inquiries

[8] The defendant's attorney asked the victim's mother whether she owed the defendant $1500, whether she owed the defendant's daughter $600, related to the purchase of an automobile, and whether the defendant recently had declined to lend her and her husband $10,000 to purchase a home. The victim's mother responded to these questions in the negative. The defendant's attorney also questioned the victim's mother about cellular telephones that the defendant either purchased or helped her to purchase, as well as outstanding cellular telephone bills related to these telephones. The victim's mother testified that the defendant "cosigned" for these telephones but that she paid for them. She also testified that the defendant had these telephones deactivated so that she could not use them.

[9] The defendant's attorney asked the victim's mother why she discussed the issue of sexual abuse with the victim as frequently as once a month. The victim's mother testified that she had been abused sexually as a child and spoke with the victim about abuse because she believed it was "good as a general practice" to do so. The following cross-examination occurred:

"Q. So this is an issue that, for obvious reasons, is extremely close to your heart, for lack of a better phrase?

"A. That's correct.

"Q. All right. Because you suffered a great deal personally as a result of having been sexually abused by some family friend, is that correct?

"A. That's correct.

"Q. Now, in that regard, isn't it true that from the time [the victim] could speak, you had been teaching her, instructing her and informing her about her private parts and the fact that they were, in fact, private, and that they should not be touched by anyone other than you, her grandmother and her father?

"A. That's correct.

"Q. Okay. And this was something, I believe, that, again, you began teaching her as soon as she could speak?

"A. That's correct.

"Q. And it was a discussion that you had with her almost on a daily basis because of the fact that you . . . yourself had been sexually abused?

"A. No, sir.

"Q. All right. What kind of language would you use when you described

are related to the subject of coaching because they help demonstrate that the victim's mother frequently discussed sexual abuse with the victim and, therefore, could have influenced the victim's allegation of abuse if she so desired. Third, the defendant's attorney later asked the victim's mother if, prior to the date on which the victim allegedly told her about the abuse, she told the victim that her "privates were going to hurt" before she went to her day care provider.

these things to her as a young girl when she began speaking?

"A. Well, I would teach her where her privates were. I would teach her to be honest and that it's okay to tell the truth to mommy and daddy.

"Q. Okay. And how would you go about teaching her where her privates were?

"A. We—when we did bath time. And I mean, its—I don't think it would be right to say as soon as she started talking. I mean, I wouldn't try to teach her that when she learned how to say mommy or daddy, but as soon as she became—was able to make sentences and have an understanding of what we were talking about in conversation.

"Q. All right. How long had she been speaking prior to June of 2002?

"A. [The victim has] been speaking since she was a year old.

"Q. Okay. So from—and that would have been when? When would she have been a year old?

"A. April of 2000.

"Q. 2000?

"A. Um-hmm (affirmative).

"Q. So, between April of 2000 and June of 2002 you had been speaking to her and instructing her with regard to her private parts on a fairly regular basis?

"A. Yes, sir.

"Q. And how would you make known to her at that tender age what her private parts consisted of? By touching alone or by speaking or by both touching and speaking?

"A. In the bathtub when we were washing, you know, giving her a bath and by speaking.

"Q. So, both touching and speaking?

"A. Yes, yes.

"Q. And, in fact, when she made this allegation known to you for the first time on June 25, 2002, that was immediately after you had one of these conversations about touching, good touching and bad touching, correct?

"A. That's correct.

"Q. Okay. So, the conversation before she made this allegation to you was, in fact, or had to do, in fact, with good touching and bad touching and private parts, is that a fair statement?

During his cross-examination of Radigan, the defendant's attorney reinforced the inference that the victim's mother caused the victim to allege the abuse.[10] This inquiry reinforced the theory, relied on by the defense, that the victim's mother was in a position to cause the victim to allege abuse.

During the defendant's case-in-chief, the defendant's attorney elicited testimony from an employee at the victim's day care center, Jennifer Takacs. He inquired with regard to whether, on June 20, 2002, the victim told Takacs that her "privates" were going to hurt her that day. The defendant's attorney also asked Takacs whether the victim told her that her mother told her that before she left her at the day care center. Takacs answered in the affirmative to both of these inquiries. The defendant's attorney also elicited testimony from Sandy Kell, the director of the victim's day care center. He asked Kell whether the victim's mother had spoken with her on June 25, 2002, and whether, as a result of that conversation, she took steps to memorialize the victim's earlier report of discomfort in writing. Kell testified that this was the case. This evidence demonstrated that the victim's mother told the victim that she

---

"A. Yes, sir."

[10] The defendant's attorney cross-examined Radigan concerning what, if any, influence the victim's mother may have had upon the victim's allegation of abuse. The following colloquy occurred:

"Q. Would it be important for you to know in coming to these general conclusions that you've talked about here today that the mother of a child, a small child particularly, alleging sexual abuse had been sexually abused herself?

"A. No, not—in my capacity here, no.

"Q. Okay. Would it be important for you to know that a, particularly a small child, say a three year old child, was constantly being instructed regarding bad touching in two ways, both by touching the instructor-parent, as well as by speaking to the instructor-parent? Would that be something you would want to know in your general evaluation of a child's circumstances who claimed to be sexually abused?

"A. I guess I would first want to know what the definition of constantly is."

would experience discomfort in her genitals, that this conversation occurred just prior to the time at which the victim allegedly told her mother about the sexual abuse and that the victim's mother went to the victim's day care provider and caused the victim's complaint to be memorialized in writing. It is not unreasonable to view this as circumstantial evidence presented to demonstrate that the victim's mother coached the victim and ensured that a record was created that would help substantiate the claim of sexual abuse.

The implications raised by the defendant during cross-examination and in the evidence that he elicited in his case-in-chief were reflected in the closing argument of the defendant's attorney. The defendant's attorney characterized the victim's mother as having a "pedophile phobia." The defendant's attorney argued that the victim's mother, having been the victim of sexual abuse herself at an early age, essentially caused the claim of sexual abuse in this case. He argued that the victim's mother "turned" what could have been "some innocent gesture" by the victim into "some sort of sexually inappropriate contact with the child by the grandfather" because of her own phobia about sexual abuse. Throughout his closing argument, the defendant portrayed the victim's mother as being inappropriately concerned with sexual abuse and suggested that she engaged in age inappropriate conversations concerning sexual abuse with the victim. The defendant argued this point to the extent that he stated, with regard to the victim's testimony, as follows: "What we think is that this is the product of an overwrought mother, who's paranoid about the crime specifically of sexual assault or the sexual abuse of children. For the good reason, most likely, albeit nonsensical, but understandable reason, that she had been abused as a child herself. And she is now so overly protective of her child that this

has resulted in this allegation, for which we all find ourselves collected here."

It is clear that the defendant elicited testimony intending to demonstrate that the victim's mother, for whatever improper reason, exerted such an influence over the victim that she caused the victim to testify falsely that the defendant had sexually abused her. The defendant clearly focused the jury's attention on the behavior of the victim's mother as an explanation for the victim's allegations. By relying on this theory of defense, the defendant asked the jury to believe that, rather than being the product of the victim's memory of past events, the victim's testimony was based on things that her mother either had told her, or had told her to say to others, concerning the defendant. The defendant argues, as he did at trial,[11] that he did not assert that the victim had been coached, but that the victim's mother had "created an environment where [the victim] felt strongly encouraged to say" that the defendant had sexually abused her. Even if the defendant properly argues that there is a distinction between suggesting that the victim had been influenced strongly by her mother to allege the abuse and suggesting that the victim was coached by her mother to allege the abuse, we disagree with the defendant that his efforts to impeach the victim's credibility were limited to the former of these two grounds. On the basis of the questioning and evidence set forth above, we conclude that the defendant raised the issue of whether the victim

---

[11] During the state's closing argument, the prosecutor argued that the defense had suggested that the victim had been coached in retaliation for the financial disagreements between the victim's parents and the defendant. At trial, the defendant's attorney argued that the defense did not assert that the victim had been coached. He further argued that, despite eliciting evidence that the victim's mother and the defendant had financial disagreements, the defense did not mean to suggest that these disputes were related to the victim's allegation.

had been coached, even if he did so by implication rather than by name.

Having determined that the defendant sought to impeach the credibility of the victim on the basis that her mother had caused her to testify untruthfully that the defendant had abused her, we next determine whether the court properly admitted into evidence Radigan's testimony concerning coaching.

Issues of credibility typically are determinative in child sexual abuse prosecutions. This is so because "in sex crime cases generally, and in child molestation cases in particular, the offense often is committed surreptitiously, in the absence of any neutral witnesses." *State* v. *Merriam*, 264 Conn. 617, 669, 835 A.2d 895 (2003). Generally, an expert witness may not express an opinion as to an ultimate issue to be decided by the trier of fact. Conn. Code Evid. § 7-3 (a). An expert witness may not testify concerning the credibility of another witness or of a particular victim. See *State* v. *Toccaline*, 258 Conn. 542, 550 n.10, 783 A.2d 450 (2001). While an expert witness is precluded from testifying with regard to the credibility of a complaining victim, he or she may nevertheless testify concerning issues that may bear on a logical assessment of a victim's credibility, particularly in cases where a minor is the alleged victim of sexual abuse. "[T]he consequences of the unique trauma experienced by minor victims of sexual abuse are matters beyond the understanding of the average person." *State* v. *Spigarolo*, 210 Conn. 359, 378, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). Our law recognizes that expert testimony concerning certain behavior patterns of minor victims of sexual abuse in general may assist the jury in assessing the credibility of a particular complaining victim. In certain circumstances, such testimony has been deemed admissible on this ground. Id.

For example, in *State* v. *Spigarolo*, supra, 210 Conn. 359, our Supreme Court held that, "where defense counsel has sought to impeach the credibility of a complaining minor witness in a sexual abuse case, based on inconsistency, incompleteness or recantation of the victim's disclosures pertaining to the alleged incidents, the state may offer expert testimony that seeks to demonstrate or explain in general terms the behavioral characteristics of child abuse victims in disclosing alleged incidents." Id., 380. The court recognized a "critical distinction between admissible expert testimony on general or typical behavior patterns of minor victims and inadmissible testimony directly concerning the particular victim's credibility." Id., 379. Evidence of the latter variety is not admissible. See *State* v. *Grenier*, 257 Conn. 797, 805–806, 778 A.2d 159 (2001) (expert testimony that minor victim was "very credible" and had "experienced" sexual abuse deemed improper).

Here, the court permitted the state to present Radigan's expert testimony concerning coaching only after it accurately observed that the defendant sought to impeach the victim on the basis that she had been coached. The testimony was of the same nature as expert testimony concerning the general behavioral characteristics of child abuse victims in disclosing alleged incidents of abuse. That is, it was specialized knowledge concerning the behavior of minor victims of sexual abuse that, in light of the defendant's efforts to impeach the victim's credibility, likely would assist the jury in assessing the victim's credibility. As an expert in conducting forensic interviews, Radigan discussed certain behaviors typically exhibited by minors that have been coached and by parents who have coached their children. Radigan did not express an opinion as to whether the victim had been coached, whether the victim or her parents were credible or whether she believed that the victim had been sexually abused. Her

opinion was relevant to the issue of the victim's credibility, but did not constitute an assessment of the victim's credibility.[12]

For the foregoing reasons, we conclude that the court's evidentiary ruling did not reflect an abuse of discretion.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[12] The defendant also claims that, in rendering her expert opinion with regard to coaching, Radigan impermissibly "buttressed the state's position that the [victim's] parents were credible witnesses and also that they had not coached their daughter." The defendant further argues as follows: "Radigan's claims about the parents' concerns fostered the impression that they would never have contributed to [the victim's] answers because of their good faith. It also impermissibly bolstered their general credibility and increased the likelihood that their other testimony would be believed, especially their vital constancy of accusation testimony." The defendant bases this claim upon Radigan's testimony in which she related her observations of the victim's parents during the interview process.

By way of his motion in limine, the defendant argued that Radigan's testimony concerning coaching was improper because it would bolster the credibility of the victim and had no bearing on the issues in the case. The defendant did not seek to preclude Radigan from testifying with regard to her observations of the victim's parents during the interview process, but with regard to the issue of coaching in general. The scope of the defendant's motion did not encompass the specific evidentiary claim he now raises on appeal. Further, the defendant did not object to Radigan's testimony at the time that she testified, or at any time thereafter, in the manner in which he now complains.

We will not review this aspect of the defendant's claim because it is unpreserved. "We have consistently refused to consider evidentiary rulings not properly preserved. Where the issue raised for the first time on appeal is a matter of state evidentiary law, rather than of constitutional significance, this court will deny the defendant appellate review." (Internal quotation marks omitted.) State v. Westberry, 68 Conn. App. 622, 628 n.3, 792 A.2d 154, cert. denied, 260 Conn. 923, 797 A.2d 519 (2002).