*James Adam Fallin v. State of Maryland*
No. 79, September Term 2017


**Criminal Procedure – Witness Credibility – Expert Witnesses.**  It is for the jury alone to determine the credibility of witnesses whose testimony and statements are relevant to the factual issues to be decided by the jury.  Thus, expert testimony as to whether another witness exhibited signs of fabrication when that witness made an out-of-court statement is ordinarily not admissible.

Circuit Court for Charles County
Case No. 08-K-15-000610
Argument: June 1, 2018

IN THE COURT OF APPEALS
OF MARYLAND

No. 79

September Term, 2017

_____

JASON ADAM FALLIN

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by McDonald, J.
Watts and Getty, JJ., concur and dissent.

_____

Filed: July 12, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

A basic principle of a criminal jury trial, incorporated in the Maryland Constitution,[1] is that the jury is the judge of the facts. A corollary is that it is "the province of the jury" to determine the credibility of the witnesses who provide evidence about those facts.[2] This Court is sometimes called upon to determine whether particular testimony is helpful to the jury in assessing witness credibility or whether it purports to supplant the jury in carrying out that function. This is one of those cases.

Petitioner, Jason Adam Fallin, was accused of abusing his daughter on three occasions when she was between five and eight years old, by inappropriately touching her genitals. Virtually all of the evidence against him consisted of testimony and out-of-court statements of the daughter. A forensic examiner testified that the daughter showed "no signs of fabrication" and that the examiner had no concerns about fabrication when she made certain out-of-court statements implicating Mr. Fallin. We hold that this testimony impermissibly intruded on the responsibility of the jury to assess the credibility of witnesses.

# I

## Background

On July 6, 2015, Mr. Fallin was indicted by a grand jury in the Circuit Court for Charles County. All of the offenses charged in the indictment were related to three alleged incidents in which Mr. Fallin inappropriately touched the genitals of his daughter, whom

---

[1] Maryland Constitution, Declaration of Rights, Articles 20, 21, 23.

[2] *Bohnert v. State*, 312 Md. 266, 277 (1988).

we shall refer to as "S." The case first went to trial in January 2016, but the jury could not agree on a verdict and the court declared a mistrial. The case was retried in April 2016. The retrial is the subject of this appeal.

S was born in September 2005 as a result of a brief relationship of Mr. Fallin with S's mother, whom we shall refer to as "Heather." Mr. Fallin and Heather eventually entered into a consent order concerning custody of S in 2009, under which S was to reside with Heather, but visit with Mr. Fallin every other weekend. At the time Heather and S resided with Mr. Fallin's parents, although Mr. Fallin himself did not live with them. Heather apparently has experienced her own challenges and S has spent much of her young life residing with either Mr. Fallin's parents or Heather's mother. S had seen Heather only once during the year preceding the trial of this case.

At the trial of this case, S herself directly testified about two of the alleged incidents. She dated one incident to sometime in 2012 (when she was five or six years old) while she was in bed with both of her parents ("the bed incident"). She also testified about a second incident that occurred inside a port-a-potty along a trail near her paternal grandparents' home in 2014 ("the trail incident"). A forensic examiner, who had interviewed S in 2012 testified that S had told her about a third incident, which allegedly occurred while S and her father were watching television in 2012 ("the television incident"), although in her own testimony S did not mention that incident and denied that there had been any incidents other than the two she testified about herself.

The issues before us arise out of the testimony of two of the State's witnesses who testified about out-of-court statements of S. One issue is whether a forensic examiner's

2

repeated opinion that S did not show "signs of fabrication" was properly admitted in evidence. Another issue is whether the Circuit Court should have provided a more detailed curative instruction to the jury about inadmissible testimony by the same examiner that she did not believe S was "incorrect" in her testimony. The remaining issue is whether testimony by one of the State's investigators concerning hearsay statements by S, although erroneously admitted in evidence, was harmless error.

To provide perspective on these issues, we first outline the legal context and then recount the evidence at trial in some detail.

## A.    *Legal Context*

### 1.    The "Tender Years" Hearsay Exception

Testimony concerning out-of-court statements of an alleged victim of child abuse may be admissible under what is known as the "tender years" exception to the hearsay rule contained in Maryland Code, Criminal Procedure Article ("CP"), §11-304. That statute concerns the admissibility of an out-of-court statement[3] of a child under the age of 13 who is an alleged victim of child abuse or of certain sex offenses. To be admissible under the statute, the statement must have been made to a person acting in the course of a particular profession, the statement must not be admissible under any other hearsay exception, the child must also testify at trial, and the statement must have "particularized guarantees of trustworthiness" according to factors set forth in the statute. CP §11-304(c), (d), (e).

---

[3] The statute defines "statement" to mean an "(1) an oral or written assertion; or (2) nonverbal conduct intended as an assertion, including sounds, gestures, demonstrations, drawings, and similar actions." CP §11-304(a).

Pertinent to this case, the out-of-court statement is admissible only if made to one of the following professionals "acting lawfully in the course of the person's profession":

      (1)     a physician;

      (2)     a psychologist;

      (3)     a nurse;

      (4)     a social worker;

      (5)     a principal, vice principal, teacher, or school counselor at a public or private preschool, elementary school, or secondary school;

      (6)     a counselor licensed or certified in accordance with Title 17 of the Health Occupations Article; or

      (7)     a therapist licensed or certified in accordance with Title 17 of the Health Occupations Article.

CP §11-304(c).

      2.     Expert Testimony Concerning Evaluation of Alleged Victim's Statements

Maryland appellate courts have previously considered the admissibility of expert opinion testimony related to the statements of an alleged victim of child abuse. Among the cases that bear on this issue and that form the backdrop for the objections made at trial are *Bohnert v. State*, 312 Md. 266 (1988); *Hutton v. State,* 339 Md. 480 (1995); and *Yount v. State*, 99 Md. App. 207 (1994).

*Bohnert*

In *Bohnert*, as in this case, the defendant's conviction of a sexual offense against a child turned on whether the jury believed certain statements of the child. In that case, the defendant lived in an apartment with a woman and her two children, a boy and a girl. The

girl alleged that the defendant frequently took her into the bathroom of the apartment to engage in sex acts. Other testimony at the trial suggested that she was jealous of her mother's relationship with the defendant and might have other motives for testifying falsely against him. The girl had twice recanted her allegations of abuse, and a physical examination found no signs of sexual abuse.

A social worker employed as a protective services investigator by the local department of social services, who had interviewed the girl and her mother, was qualified by the trial court as an expert in the field of child sexual abuse. In response to a question from the prosecution, the social worker responded that, in her opinion, the girl was a victim of sexual abuse. While the social worker alluded to other sources of information, she said that her opinion was based chiefly on statements made by the girl.

The jury convicted the defendant of the charges and the Court of Special Appeals affirmed the conviction. This Court, however, reversed, holding that it was an abuse of discretion to admit the social worker's opinion as to the girl's credibility.

The Court first observed that the social worker's opinion was based solely on what the girl had told her, as there were no eyewitnesses or physical evidence and the only other evidence was similar statements made by the girl to her mother or others. The Court observed that, while the admission of expert testimony on a particular subject is normally a matter within the discretion of a trial court, the social worker's opinion rested solely on the statements of the girl, who was also a witness in the case, and thus essentially amounted to an opinion concerning that witness' credibility.

The Court stated:

> In a criminal case tried before a jury, a fundamental principle is that the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury…. It is … error for the court to permit to go to the jury a statement, belief, or opinion of another person to the effect that a witness is telling the truth or lying. Whether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper, either on direct or cross-examination.

312 Md. at 277 (citations omitted). Noting that the results of lie detector tests are not admissible, the Court stated that no one "can qualify as an 'expert in credibility' no matter what his experience and expertise" and reiterated that the credibility of a witness is solely the province of the jury. *Id*. at 278. "It is the settled law of this State that a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth." *Id*.

The Court concluded that, in the case before it, the social worker's opinion that the girl had been sexually abused was "tantamount to a declaration by [the social worker] that the child was telling the truth…" *Id*. Such an opinion was "inadmissible as a matter of law" and the trial court had no discretion to admit it. *Id.* at 279.

*Hutton*

The Court reiterated that principle in *Hutton,* which also arose out of a child sex abuse prosecution. In that case, a social worker who had counseled the alleged victim testified in the State's case. The social worker described characteristics of children who have been sexually abused and stated that the alleged victim exhibited many of those characteristics. When asked by the prosecutor how she assessed credibility of her client,

6

the social worker said that she looked for, and found, "consistency" in the client's statements. 339 Md. at 485-88. The State also called a psychologist who had interviewed the alleged victim. The psychologist opined that the child suffered from post traumatic stress disorder ("PTSD") which, in the psychologist's opinion, was attributable to child sex abuse. *Id*. at 488. When asked by the State how she assessed the child's credibility, the psychologist responded that, in her opinion, the child's representations were "not in any way faked." *Id*. at 490.

This Court reversed the defendant's conviction in *Hutton*, in part on the basis that the testimony of the social worker and the psychologist concerning the alleged victim's credibility was contrary to the holding in *Bohnert*. The social worker had been permitted to "indicate her opinion of the victim's consistency and, indirectly, her truthfulness." *Id*. at 505. The psychologist's testimony amounted to a "credibility assessment, a matter outside [her] area of expertise and one historically and appropriately entrusted to the jury." *Id*. at 503.[4]

*Yount*

In *Yount*, the Court of Special Appeals held that generic testimony concerning statements by victims of child abuse was admissible. In that case, the defendant was charged with abusing his eight-year-old daughter. The daughter, who had recanted the allegation of abuse and then recanted the recantation, testified in the State's case-in-chief

---

[4] A concurring opinion of two members of the Court would have allowed a larger role to testimony concerning PTSD in child sex abuse cases, but agreed with the majority that "the rule of *Bohnert* … was violated." *Id*. at 507-8.

7

that her father had abused her. In its rebuttal case, the State called a professional counselor who was qualified by the trial court as an expert in child abuse and who testified that it was common for victims of child abuse to recant their initial reports of abuse. The counselor did not express an opinion about the statements of the daughter in the case on trial. The jury convicted the defendant, who challenged the admission of the expert's testimony on appeal.

The Court of Special Appeals first held that expert testimony by the counselor concerning "the arcane context of sexual child abuse … would be of appreciable help" to the jury. 99 Md. App. at 212. The court next determined that the counselor's training and experience rendered her qualified to provide that testimony. *Id*. at 213. The court noted that the counselor had not testified on the ultimate issue in the case – whether the abuse had occurred – and was not testifying directly on the issue of the victim's credibility, but rather on "a phenomenon that had a bearing on an assessment of … credibility." *Id*. at 214.

The court distinguished the situation before it from that in *Bohnert*. The expert testimony concerning recantation simply "advised the jury as to the existence of a psychological phenomenon that would explain the … victim's wavering or vacillation. Beyond that, it did nothing to indicate that the victim's version of events rather than the appellant's version of events should be believed." *Id.* at 218-19. The intermediate appellate court held that the testimony was admissible and affirmed the conviction.

## B.    *The Evidence at Trial*

### 1.    Testimony of S, Her Mother, and Her Maternal Grandmother

*Trial Testimony of S*

S testified that, when she was five and six years old, she lived with Mr. Fallin's parents, who sometimes took trips to North Carolina. She said that, on one occasion when her grandparents were away, she was lying in bed with Heather and Mr. Fallin with her eyes closed, when Mr. Fallin touched her "in the private area." S testified that it hurt badly and that she later told her mother and her maternal grandmother about the incident.

S recounted a second incident that she believed also happened when she was six years old. During a time when she was staying with her paternal grandparents, she went for a walk on a nearby trail with Mr. Fallin. According to S, when she told Mr. Fallin she had to go to the bathroom, he took her to a port-a-potty on the trail. While they were inside, he touched her in the front of her private area in a way that felt like "scratching." She said that, after she pulled her pants up, they left the port-a-potty and went back on the trail, where she told him he could not do that because there were people around. S also testified that on the way back on the trail Mr. Fallin pulled her pants down outside and took a picture of her. She later told her mother about the incident.

S testified that she wanted to continue to see her father, but she did not want him to touch her again in her private parts. She denied that he had touched her in that way on any other occasion.

9

*Heather*

Heather testified that, from 2008 through 2012, she and S lived with Mr. Fallin's parents, with whom she had a good relationship. Mr. Fallin did not live with them at the time, but visited his daughter under the custody consent order.

According to Heather, her daughter had twice reported to her that Mr. Fallin had touched her inappropriately. The first occasion was sometime in 2012. According to Heather, S told her on that occasion about "touching" by Mr. Fallin. Heather moved herself and S out of the Fallins' home and into her own mother's home. She obtained a protective order against Mr. Fallin but did not call the police. The protective order temporarily halted visitation but, upon its expiration, visitation between S and Mr. Fallin resumed.

Heather testified that the second occasion was two years later in 2014 after she had picked up S from a visit with Mr. Fallin. At that time, S told her that Mr. Fallin "had dug her again." Heather understood S to mean that Mr. Fallin had touched his daughter's genitals. Heather then called the police.

Heather testified that she had ceased living with her mother and S in January 2015 and that she had seen her daughter only once during the year prior to her testimony, a situation that she attributed to her own health issues.

*Heather's Mother*

Heather's mother (S's maternal grandmother) testified that she and Mr. Fallin's mother had helped arrange Mr. Fallin's visitations with S under the custody consent order. In July 2012, S told her about an incident a week or two before in which her father had touched her genitals. S said that she had been sleeping on one side of the bed next to her

10

mother and that she woke up with Mr. Fallin's hands in her underwear "digging her." The grandmother called the Sheriff's Office and accompanied Heather to obtain a protective order.

Two years later in 2014, S again reported inappropriate touching by her father. The grandmother called S's pediatrician and then contacted the Sheriff's Office. The grandmother accompanied Heather and S to the Sheriff's Office to report the incident. She and Heather then obtained a second protective order against Mr. Fallin in late 2014.

She testified that she had been S's temporary guardian since January 2015, when Heather had left her home.

2.      The Sheriff's Office Investigation – February and March 2014

In February 2014, a detective from the Charles County Sheriff's Office was assigned to investigate the trail incident. At the outset of her investigation, the detective interviewed S at the station in the presence of Heather and Heather's mother. According to the detective, S reported to her that Mr. Fallin had touched her genitals in a port-a-potty while they were on a walk on the trail behind her paternal grandparents' home. The detective went to the trail and confirmed that there were port-a-potties along the trail.

The detective met with Mr. Fallin on March 11, 2014. During that interview, Mr. Fallin told the detective that he had taken walks on the trail with his daughter and his parents. In response to the detective's questions, Mr. Fallin denied that he had touched his daughter's genitals and said that there were no nude pictures of her on his phone. When the detective told Mr. Fallin that she was going to obtain a search and seizure warrant for his cell phone, he turned over the phone and volunteered the passcode to it.

11

The mobile phone forensics examiner for the Sheriff's Office testified that he had examined Mr. Fallin's cell phone and determined that it had only two days of data on it. He successfully extracted the files from the cell phone, which included one photograph of S. In the photo she was clothed and standing outdoors. The forensics examiner determined that the photograph had been taken with a camera other than the camera on the cell phone.

A forensic nurse examiner testified that she had conducted a physical examination of S in February 2014. S told the nurse that she had been touched in her genital area. The nurse examined S's genitals and noted no trauma, which she said could be "consistent" with genital touching.

### 3. Report from Mr. Fallin's Therapist – September 2014

A licensed clinical social worker therapist, who was Mr. Fallin's therapist from 2010 through 2014, was called as a witness by the State. She testified that, during a session with her in September 2014, Mr. Fallin told her about a dream in which S had spent the night at his residence. In the dream, he had woken up with an erection, placed his hand in S's pants, apologized to her when she awoke, and heard her say "That was okay, Daddy." Mr. Fallin told the therapist that he was "90 per cent sure" that what he recounted was a dream, but was not absolutely certain.

Under Maryland law, a licensed clinical social worker is required to notify the local department of social services or an appropriate law enforcement agency if the social worker has reason to believe that a child has been subjected to abuse or neglect. Maryland Code, Family Law Article ("FL"), §5-704. In light of that provision, the therapist contacted the authorities concerning Mr. Fallin's statements to her during the session. On cross-

examination, the therapist acknowledged that Mr. Fallin was on medications when he was seeing her and that she could not say how the medications may have affected what he told her.

4. Forensic Interviews of S

The issues before us concern testimony about two forensic interviews of S that were conducted in 2012 and 2014. Evidence of out-of-court statements made by S during those interviews was introduced under the "tender years" exception to the hearsay rule.

*August 2012 Forensic Evaluation – Meredith Drum, Professional Counselor*

In August 2012, Meredith Drum, a licensed counselor, who was working at the time as a psychotherapist with the Center for the Children, conducted a forensic evaluation of S. That evaluation consisted of four sessions with S, one of which was attended by Heather.

In anticipation of Ms. Drum's testimony, the defense raised two objections. First, it objected to any testimony by Ms. Drum about whether she had observed signs of fabrication by S during the sessions. Referring to similar testimony that Ms. Drum had given during the first trial of the case,[5] the defense argued that such testimony would be contrary to the holding in *Bohnert*. The defense reasoned that testimony that S had not exhibited signs of fabrication would be the functional equivalent of saying that she was telling the truth and that Ms. Drum would be "functioning as a human lie detector." Second, the defense argued that allowing Ms. Drum to provide hearsay testimony that S had described a third incident of inappropriate touching – the television incident – when S

---

[5] Ms. Drum had testified at the earlier trial, which had resulted in a hung jury.

13

had not described such an incident in her own trial testimony would violate Mr. Fallin's constitutional right of confrontation.

In response, the State contended that admission of Ms. Drum's testimony would not be contrary to *Bohnert* and would be permissible under *Yount* because Ms. Drum would not directly opine on the ultimate issue of whether S had been sexually abused. As to the confrontation issue, the State argued that the defense had had an opportunity to cross-examine S about whether the television incident happened, if it had wished to do so.

After a lengthy discussion, the Circuit Court ruled that Ms. Drum could testify about her training concerning signs of fabrication and state whether she had observed signs of fabrication by S, but could not testify directly whether S was lying or telling the truth. With respect to the confrontation issue, the court overruled the objection, stating that the defense should not have been surprised by Ms. Drum's anticipated testimony about the television incident and had made a choice not to cross-examine S about that alleged incident. Defense counsel asked "if we could have a continuing objection so we don't have to keep objecting," to which the court responded affirmatively.

Later, as Ms. Drum was about to take the stand, the court and counsel revisited the discussion:

> The Court: All right.
>
> Okay.
>
> So just to be clear I have; maybe you already said, but I have all your objections on mistrial; all of them noted.
>
> If something else comes up please but [sic].

14

Defense Counsel:   And yeah, just to clarify it.

The Court:   Yeah.

Defense Counsel:   Anything; even though Your Honor I think sort of agree [sic] with me in part on the fabrication stuff.

The Court:   Um hum.

Defense Counsel:   Any; the signs of fabrication and not seeing any is the functional equivalent in my view.

The Court:   Right.

Defense Counsel:   And frankly I think any reasonable interpretation.

The Court:   Come on up, Ma'am.

Come on up, Ma'am.

Go ahead.

I got it.

I got your objection to it.

Defense Counsel:   The functional equivalent of saying she's not fabricating it.

Defense Counsel:   Yeah.

The Court:   Okay.

Defense Counsel:   And anything like that where you have the functional equivalent of saying I think she's credible.

The Court:   I got it.

I got you.

15

Ms. Drum then testified that she had received training at the National Children's Advocacy Center in Alabama, and at the National Center for Forensic Interviewing. She said that her training taught her how to conduct extended multiple-session evaluations of children, how to start with broad questions and move to narrower ones, and what signs to look for to determine if a child is fabricating or being coached. According to Ms. Drum, such signs include the immediate and unsolicited disclosure of sexual abuse, "using the exact same phrase repeatedly," and the use of "too grown up language." It was not clear from Ms. Drum's testimony whether this list was meant to be exhaustive.

The court found that Ms. Drum was qualified as an expert in the field of child abuse disclosure and clinical counseling in the area of child abuse.

Ms. Drum testified that she met with S four times in August 2012. The first session was devoted to getting to know S and building rapport. Ms. Drum said that S, who was six years old at the time, was talkative and bouncy. According to Ms. Drum, it is not a "goal" of the initial session to obtain disclosures of child abuse, and S did not say anything about being molested or touched during that interview.

Ms. Drum testified that, during their second session, S told her that her father had "digged her" and pointed to her groin area. According to Ms. Drum, S said that the "digging" occurred at her grandparents' house when the grandparents were away in Florida and while S was in bed with her mother and father. S said she would scream when the digging happened. According to Ms. Drum, S was concerned about whether she would "get in trouble" for telling Ms. Drum about it, but Ms. Drum assured her that she would not. S said that she was scared to return to her father's house.

16

During their third session, according to Ms. Drum, S again mentioned that Mr. Fallin had "digged" her and pointed to the vagina on an anatomical drawing of a girl. S talked about the same incident as in the second session and recounted an additional detail – *i.e.*, that she was wearing pajamas.

Ms. Drum testified that, during their fourth and final session, S told her about a second incident with her father. According to Ms. Drum, S said that Mr. Fallin touched her when they were in the living room of her grandparents' house watching television.

Ms. Drum said that S had told her that she had never experienced any bad touches by anyone else.

Throughout Ms. Drum's testimony, the prosecutor repeatedly asked her whether she had observed signs of fabrication or coaching in S during their several sessions together. Ms. Drum consistently denied observing such signs in S. At the conclusion of the State's direct examination, the State reiterated those questions and Ms. Drum testified as follows:

> Prosecutor: Throughout your four sessions did you have any concern that [S] was fabricating?
>
> Ms. Drum: No.
>
> Prosecutor: Did you have any concern that she was being coached?
>
> Ms. Drum: No.
>
> Prosecutor: Did you observe any of the signs in which you were taught through your training and experience that she was being coached or this was fabricated?
>
> Ms. Drum: No.

17

Later, during redirect examination, the State again asked:

| | |
|---|---|
| Prosecutor: | And is there any indication in your sessions with [S] that when she was disclosing her father as the person who was digging her that she was incorrect? |
| Ms. Drum: | No. |

The defense objected, and a bench conference ensued. Defense counsel argued that the testimony had crossed the line into an assertion by Ms. Drum that S had been truthful in identifying her father as a perpetrator of child sexual abuse. The following colloquy took place:

| | |
|---|---|
| Defense Counsel: | And she also asked earlier subject to our continued objection, do you have any concerns about whether she was fabricating or not. That – |
| The Court: | Well, that's interesting cause I was surprised you didn't object on that one. |
| Defense Counsel: | Well, the continuing objection so I. |
| The Court: | That's for somebody else to decide. |
| | I thought that was slightly different but whatever. |
| Defense Counsel: | I; if it wasn't covered I move to strike it. |
| | . . . |
| The Court: | Okay. |
| | That's fine. |
| | Just stand by. |
| | One thing at a time. |

18

After some discussion, the Circuit Court concluded that the question was improper. Defense counsel then asked for a curative instruction "in light of that and the other two questions which I thought were covered by our continuing objection." The court replied "Yeah, maybe they were." The defense then requested the following instruction:

> [I]t is for the jury alone to assess whether a witness or an alleged victim is telling the truth.
>
> It is not an appropriate subject for expert testimony to tell you whether or not they believe someone's telling the truth.

The State asserted that the instruction was incorrect under the law, and that it specifically disagreed with the second part. The court ended the bench conference stating that it would take up the proposed curative instruction after Ms. Drum's testimony concluded.

The State then asked Ms. Drum if she had "any concerns" based on her training and experience, and the court sustained an objection because the question went "too far." The State then once again asked Ms. Drum if she had "observe[d] any signs of fabrication or coercion" and Ms. Drum responded, "No."

After Ms. Drum finished testifying, the defense requested the same two-part instruction as earlier. The court said it was not going to give the second part because "I don't think that's what happened." The State also objected to the second part because an "expert witness can assess the credibility. That's exactly what [*Yount*] said can happen." The court said it was not going to go as far as putting in the second part of the instruction and said it understood that the defense wanted it in.

19

Shortly after the discussion, the court told jurors:

> All right ladies and gentlemen just a couple things:

> Just as a reminder it is for you alone to determine the credibility of any witness; that's Number 1.

> Number 2, the Court has to; you probably noticed the courtroom's filling up, take up some other matters …

This was followed by a lengthy instruction to the jury about adjourning for the day.

*September 2014 Forensic Interview – Melissa Mohler, Social Services Investigator*

In September 2014 – more than two years after S had been interviewed by Ms. Drum – she was interviewed by Melissa Mohler, a child protective services investigator with the Department of Social Services, as a result of the report made by Mr. Fallin's therapist. Ms. Mohler testified that S had seemed "happy-go-lucky" and had no trouble communicating during their single interview. Over a hearsay objection, Ms. Mohler recounted statements that S had made during that interview.

Ms. Mohler testified that she told S what Mr. Fallin had said to his therapist. According to Ms. Mohler, S had responded that Mr. Fallin was lying when he said he had abused her recently, when in fact he had not done so. S also said that Mr. Fallin had lied twice in the past when he denied abusing her, when he had in fact done so.

Ms. Mohler said that S also told her about her interview with the detective from the Sheriff's Office earlier that year. S told Ms. Mohler that she had not been alone with Mr. Fallin since that interview with the detective and that Mr. Fallin had not touched her private area in the week prior to their interview. S said that Mr. Fallin had apologized to her about

20

touching her private area.  According to Ms. Mohler, S said that, in response to the apology, she had told her father that he "cannot do that to me."

Ms. Mohler also testified about a conversation she had with Mr. Fallin and his mother.  Mr. Fallin told Ms. Mohler that he believed that S was just repeating what Heather and Heather's mother had told her to say.  Mr. Fallin said that he loved S and would relinquish his rights to visitation out of concern for her well-being.

5.    The Defense Case

The defense called two of Mr. Fallin's relatives as witnesses.  An aunt, who happened to be a licensed clinical professional counselor, testified that she had had frequent contact with S since her birth.  She said that S had never disclosed anything to her that would have triggered the mandatory duty under FL §5-704 to report suspected child abuse or neglect.

Mr. Fallin's sister-in-law testified that she had a son close in age to S who was "best friends" with S.  She recounted that, on a weekend, in late January or early February 2014, she and Mr. Fallin took S and her son for a walk on the trail.  The children got cold, and they returned home after only walking about 500 feet.  She said that there were 10 or 12 other people out on the trail that day and that S never used a port-a-potty.  The sister-in-law testified that her son had never told her that S had disclosed any sort of sexual abuse.

Mr. Fallin elected not to testify in his defense.

*C.*     *Legal Proceedings*

1.     Verdict and Sentencing

The 12-count indictment against Mr. Fallin included one count of continuing course of conduct involving sex crimes against a child, in violation of Maryland Code, Criminal Law Article ("CR") §3-315, three counts of third-degree sexual offense in violation of CR §3-307, three counts of fourth-degree sexual offense in violation of CR §3-308, three counts of sexual abuse of a minor in violation of CR §3-602, and two counts of second-degree assault in violation of CR §3-203.

During the trial the State dismissed, by *nolle prosequi*, four of the charges – in particular, the count charging a continuing course of conduct and three counts related to digital anal penetration.  On April 22, 2016, the jury began its deliberations on the remaining eight counts.  After deliberating that morning, the jury sent a note to the court stating that they were "hung on all counts."  With the assent of counsel, the court repeated the standard instruction it had given earlier on the jury's duty to deliberate.[6]  Later that afternoon the jury returned a verdict finding Mr. Fallin guilty of three charges, all of which related to the bed incident, but could not reach a verdict on the five remaining charges related to the trail incident or the television incident.

On July 15, 2016, the Circuit Court sentenced Mr. Fallin to 25 years incarceration, with all but 21 years suspended, for sexual abuse of a minor, and 10 years concurrent for

---

[6] *See* Maryland State Bar Association, Maryland Criminal Pattern Instructions (2d ed. 2012), MPJI-Cr. 2:01.

the third-degree sexual offense conviction, with five years supervised probation. The second-degree assault conviction was merged into the sexual offense conviction for purposes of sentencing.

2. Appeal to Court of Special Appeals

Mr. Fallin appealed to the Court of Special Appeals. In an unreported decision dated October 13, 2017, the intermediate appellate court affirmed his convictions. With respect to the issues before us, that court concluded that, although some of the evidence had been admitted in error, it did not require reversal of Mr. Fallin's convictions.[7]

With respect to the testimony of Ms. Drum, the Court of Special Appeals distinguished her testimony from that in *Bohnert*. Citing *Yount*, the intermediate appellate court reasoned that Ms. Drum simply applied "objective knowledge" in testifying that S did not exhibit signs of fabrication or coaching and that she had not opined directly as to whether S was telling the truth.

With respect to Ms. Mohler's testimony reporting out-of-court statements made by S, the court held that the testimony was inadmissible because Ms. Mohler did not come within any of the occupational categories of CP §11-304(c) and therefore the statutory "tender years" hearsay exception did not apply to her hearsay testimony. However, the

---

[7] The Court of Special Appeals also considered Mr. Fallin's arguments that the prosecutor had included facts not in evidence in her rebuttal argument to the jury and that the trial court had admitted certain allegedly irrelevant evidence. The intermediate appellate court found no merit in either of those arguments and Mr. Fallin has not pursued those contentions before us.

court concluded that, in light of the fact that S herself had testified at trial about the same information, it was clear beyond a reasonable doubt that the erroneous admission of the hearsay statements of S through Ms. Mohler did not affect the verdict.

We granted Mr. Fallin's petition for *certiorari* and the State's cross petition.

## II

## Discussion

Mr. Fallin presents three questions for review:

(1) Whether Ms. Drum's testimony that S exhibited no signs of fabrication or coaching, and that Ms. Drum had no concerns on that score, was admissible.[8]

(2) Whether the Circuit Court should have given the jury a curative instruction that credibility of a witness – *i.e.*, S – was not a proper subject of expert testimony.

(3) Whether allowing an unlicensed social services investigator – Ms. Mohler – to testify as to out-of-court statements of S was harmless error.

In its cross-petition, the State raised the issue as to whether Mr. Fallin had adequately preserved objections related to the first two questions.

For the reasons set forth below, we conclude that Mr. Fallin preserved his objection to Ms. Drum's testimony and that her opinion as to whether S showed signs of fabrication or coaching was inadmissible under *Bohnert*. Accordingly, we remand the case for a new trial and need not address the second and third questions.

---

[8] Mr. Fallin stated two related questions in his petition that, in our view, are both subsumed in this issue.

## A.  *Preservation*

As a preliminary matter, the State argues that at least part of Mr. Fallin's objection to Ms. Drum's testimony was waived and not preserved. In particular, the State contends that (1) it is ambiguous whether the defense's continuing objection to Ms. Drum's testimony related to its argument under *Bohnert,* as opposed to the confrontation issue related to Ms. Drum's testimony about the television incident; and (2) even if the defense had registered a continuing objection under *Bohnert*, that objection concerned only the testimony by Ms. Drum that she saw no "signs" of fabrication and not her testimony that she had no "concerns" about fabrication.

In a criminal trial, an objection to evidence is waived unless the party objects at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Maryland Rule 4-323(a). The court may grant a continuing objection to a line of questions, but such an objection is effective only as to questions "clearly within its scope." Maryland Rule 4-323(b).

In our view, the State's waiver argument parses the defense objections and the trial court's rulings too finely. As set forth above, there was a lengthy colloquy between the Circuit Court and counsel concerning the defense objections to Ms. Drum's testimony. Most of that discussion involved the defense objection based on *Bohnert* that Ms. Drum's testimony about whether S had shown signs of fabrication in their August 2012 sessions amounted to an opinion by Ms. Drum that S's statements to her were true. It is true that the defense also raised a confrontation issue concerning her testimony about the alleged television incident, on the basis that S herself had not testified about such an incident and

25

had, in fact, denied that there were any touching incidents besides the two – the bed incident and the trail incident – that S described in her own testimony. At the conclusion of the colloquy the defense asked for a "continuing objection so we don't have to keep objecting." The Circuit Court assented to that request. Later, immediately before Ms. Drum took the stand, the Circuit Court noted that "I have all your objections on mistrial"[9] and defense counsel again reiterated his argument based on *Bohnert*, to which the court affirmed "I got it."

A fair reading of the record reveals that the defense adequately stated a continuing objection under *Bohnert* – whether characterized as "signs" or "concerns" about fabrication. The main thrust of the defense objection to Ms. Drum's testimony was clearly based on *Bohnert*. The essence of that objection (equating Ms. Drum's expected testimony with the social worker's opinion in *Bohnert*) was repeated multiple times, including immediately before Ms. Drum took the stand, and the Circuit Court repeatedly gave affirmative responses such as "I got it" while disagreeing with the defense on the substance of the objection. It is perfectly understandable why the defense did not object each time Ms. Drum repeated her conclusion during her subsequent testimony that S had not

---

[9] The defense had filed a written motion for a mistrial three months earlier during the first trial of the case related to the testimony of Mr. Fallin's therapist. There is no evident reason that the court would be referring to that motion, which concerned a different trial and a different witness, at this juncture. It seems more likely that the court was referring to the contemporaneous defense objections to the testimony that was then under discussion.

exhibited signs of fabrication during their four sessions or that Ms. Drum did not have "concerns" about fabrication.

The State argues that the defense must not have understood the scope of its continuing objection to be so broad and points to an objection registered by the defense toward the conclusion of Ms. Drum's direct examination. On that occasion, the defense objected when the prosecutor went a step beyond her previous questions and asked Ms. Drum if she had any concerns whether S's statements that Mr. Fallin had abused her were "incorrect." This question clearly was not within the parameters permitted by the trial court's earlier ruling overruling the defense objection to the "signs of fabrication" questions. The trial court agreed that this new question was "improper." While under the defense theory this question was as impermissible as the "signs of fabrication" questions, it was not the same question to which the defense had lodged an advance continuing objection and lost. Thus, the fact that defense counsel objected to this new question is not an indication that the scope of its continuing objection was too narrow to encompass questions concerning "signs" or "concerns" about fabrication.

**B.    *Whether Expert Testimony Concerning Signs of Fabrication by Another Witness is Admissible***

As outlined earlier,[10] a fundamental principle underlying trial by jury is that "the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury." *Bohnert*, 312 Md. at 277. Accordingly, a trial court may

---

[10] *See* Part I.A.2 of this opinion.

27

not ordinarily permit questioning that calls for one witness to assess the credibility of testimony or statements made by another witness concerning the facts of the case. This is not to say that a witness may not offer the jury general information that may be useful to the jury in making the credibility determinations, such as character evidence or tools related to the assessment of credibility.

*Character Evidence Related to General Credibility*

A person designated as a character witness may provide opinion or reputation evidence about the general credibility of another witness. *See* Maryland Rule 5-608. Under that rule, a person who knows the witness or the witness' reputation may testify that the witness has a reputation for truthfulness or untruthfulness or that, in the person's opinion, the witness is a truthful or an untruthful person. *Id.*

There is no contention here that this rule would apply to the testimony provided by Ms. Drum. First, to come within Rule 5-608, there must be a basis for the character witness' opinion or knowledge – *i.e.*, the character witness must establish past knowledge of the witness or the witness' reputation. In this case, Ms. Drum explicitly disclaimed any prior familiarity with S. Indeed, she indicated that it would have been unethical for her to have conducted a forensic interview with a child that she knew prior to the interview.

Second, a character witness does not express an opinion on specific testimony or statements of a witness that are at issue at trial – *i.e.* whether they are true or false, straightforward or fabricated. Rather, the character witness testifies as to the general reputation or propensity of the witness to tell the truth. It becomes another factor that the jury can consider in carrying out its role to assess the credibility of the statements made by

28

the witnesses who appear before it. By contrast, in this case, Ms. Drum had nothing to say about S's general character or propensity to tell the truth. Rather, she expressed an opinion as to whether S showed signs of fabrication in making the out-of-court statements that were admitted in evidence under the "tender years" exception to the hearsay rule and that went directly to the issues before the jury.

### *Other Tools for Assessing Credibility Generally*

There may also be circumstances, as exemplified in *Yount,* where expert testimony concerning particular categories of witnesses, such as child witnesses or abuse victims, may be helpful to a jury. As described earlier, the State presented expert testimony in that case concerning the frequency with which victims of sexual assaults recant reports of assaults. Unlike this case, the expert in *Yount* did not provide any opinion specific to the complainant in that case or the charges at issue in the trial. It was left to the jury in *Yount* to decide whether and how to apply the information concerning recantations should affect their evaluation of the testimony of the complaining witness. By contrast, in this case, Ms. Drum did not so much advise the jury on how to assess a witness for signs of fabrication as provide her own conclusions on the credibility of the primary prosecution witness. In reversing a conviction based on similar expert testimony, the Ninth Circuit emphasized this distinction:

> The testimony of the experts in this case was not limited to references to psychological literature or experience or to a discussion of a class of victims generally. Rather the experts testified that these particular children in this particular case could be believed.

*United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985).

This case would be closer to *Yount* if a witness such as Ms. Drum had simply provided the jury with expert information on some signs of fabrication or coaching they might look for and if the jury was able to use that information as it chose in forming its own judgment as to the credibility of S. However, the jury had no basis for applying the signs of fabrication identified by Ms. Drum to the out-of-court statements that Ms. Drum reported and therefore no basis for assessing the accuracy of Ms. Drum's opinion whether S showed such signs. No tapes or even transcripts of the interviews of S by Ms. Drum were before the jury.[11] In response to questions concerning what S said during their interviews, Ms. Drum frequently confessed to a lack of recollection and had to consult her notes – by our count, at least 16 times over the course of her testimony. This no doubt was an effort on her part to be as accurate as possible in responding to those questions. However, it may be questioned how Ms. Drum, who understandably could not remember *what* S said during interviews that had taken place in August 2012 – more than three and a half years before her testimony at the trial – could nevertheless remember important details as to *how* S said what she said – *e.g.*, whether she repeated the "exact same phrase" or used "grown up" language.

---

[11] Ms. Drum's sessions with S had been audio and video recorded. However, the recordings were not produced at trial, despite being subpoenaed by the defense. At the request of the defense, the court included a missing evidence instruction in its final charge to the jury.

*Expert Opinion About a Witness' Credibility in the Particular Case*

The testimony at issue in this case appears to be indistinguishable from that which this Court found impermissible in *Bohnert* and *Hutton*. Ms. Drum testified that she concluded, based on her training and expertise, that there were no "signs" of fabrication or coaching in S's out-of-court statements to her. As a result, she had no "concerns" about fabrication by S or coaching by someone else. The inevitable conclusion from that testimony, which the prosecutor asked her to draw explicitly, was that S's statements concerning touching incidents by Mr. Fallin were not "incorrect" – *i.e.*, true. That testimony was no less problematic than the social worker's testimony in *Hutton* that she found the victim's statements credible because of their consistency, the psychologist's opinion in that case that the representations of the victim to her were "not in any way faked," or the social worker's testimony in *Bohnert* that she had concluded that the alleged victim had suffered abuse.

The State argues that Ms. Drum's testimony is distinguishable from that of the social worker in *Bohnert* on the ground that Ms. Drum was providing the jury with information about objective tests – *i.e*., particular signs of fabrication – rather than a general conclusion about the alleged victim's credibility. In the State's view, Ms. Drum was merely providing a tool to the jury to use in its own assessment of S's out-of-court statements.

As explained above, it is not clear how the jury was supposed to apply this information itself to the out-of-court statements. Moreover, the distinction advanced by the State is difficult to discern. As one court has observed, the "subtle distinction between an expert's testimony that a child *has or has not been coached* versus an expert's testimony

31

that the child *did or did not exhibit any signs or indicators of coaching* is insufficient to guard against the dangers that such testimony will constitute impermissible vouching." *Sampson v. State*, 38 N.E.3d 985, 991-92 (Ind. S. Ct. 2015) (emphasis in original).[12]

In this regard, it is instructive to compare the evidence derived from a polygraph examination to the testimony given in this case. Evidence derived from a polygraph examination – *i.e.,* a lie detector test – is widely held to be inadmissible in evidence, in part because it amounts to expert opinion testimony on whether a witness is telling the truth or fabricating. *See United States v. Scheffer*, 523 U.S. 303, 312-14 (1998); A. Shniderman, *You Can't Handle the Truth: Lies, Damn Lies, and the Exclusion of Polygraph Evidence*, 22 Albany L. J. Sci. & Tech. 433, 434 (2012).

A polygraph machine precisely measures certain physical characteristics of a person – blood pressure, pulse, respiration rate, and galvanic skin resistance – while the person is

---

[12] The State points out that some jurisdictions permit testimony about whether a victim exhibited "indications of coaching" after a defendant "opens the door" by contending that the alleged victim was coached to accuse the defendant. *See Sampson, supra,* 38 N.E.3d at 991. We agree that otherwise inadmissible testimony may become relevant and admissible to respond to an issue introduced into a case by an opposing party.

The State argues that the defense opened the door in this case in its cross-examination of Ms. Mohler concerning her interview of Mr. Fallin with his mother. However, in this case, the exception to the general rule does not apply for a couple of reasons. First, Ms. Mohler's interview of Mr. Fallin and his mother concerning the trail incident took place in late 2014, more than two years after Ms. Drum's sessions with S in 2012 concerning a different allegation. Second, at the trial, Ms. Drum was asked not only about signs of "coaching" of S, but also about signs and concerns about fabrication by S generally, as well as whether S was "incorrect" in describing abuse by Mr. Fallin. If the exception is construed broadly to encompass any case in which the credibility of the complaining witness is an issue, the exception will swallow the *Bohnert* rule.

32

answering questions posed by the polygraph examiner.  P. Gianelli, *Polygraph Evidence: Post Daubert*, 49 Hastings L.J. 895, 903-6 (1998).  The machine produces a detailed report of those measurements that can be correlated to specific answers given by the person.  The polygraph examiner reviews that report to determine whether that data "indicates deception" by the person in the answers to particular questions.  *Id*. at 905.

In the trial of this case, Ms. Drum testified that she looked for certain "signs of fabrication" – the volunteering of information, repetition of the "exact same phrase," use of "too grown up language" – as she questioned S.  Much as a polygraph examiner considers the readings from the machine's instruments to determine whether there were indications of "deception," Ms. Drum considered the form and content of S's answers for indications of "fabrication." Ms. Drum's testimony in that regard was thus essentially identical to the testimony a polygraph examiner would give, except based on less precise and more subjective data.[13]  While Ms. Drum may not quite have purported to function herself as a "human lie detector" (as defense counsel suggested at trial), her testimony was indistinguishable from that of a person who operates a lie detector and reports the results.

The State also draws a comparison to *Brooks v. State*, 439 Md. 698 (2014).  That case concerned a violent sexual assault against an adult woman.  At the trial of that case, a SAFE nurse detailed her various findings from a forensic physical examination of the

---

[13] A polygraph examination may be open to criticism that it is ultimately based on the subjective judgment of the particular examiner who determines the significance of the data collected by the machine.  *See* P. Gianelli, *supra*, 49 Hastings L.J. at 905 (stating that "[t]he examiner's role cannot be overstated" and acknowledging that examiners may lack adequate training).

victim. At the conclusion of that testimony, the prosecutor posed a binary question to the nurse: were her findings "consistent or inconsistent" with a sexual assault? The nurse responded that her findings would "verify" that the victim had been sexually assaulted. This Court held that, while the nurse had perhaps made a poor choice of a synonym, in context it was clear that she was affirming that her findings were "consistent" with a sexual assault and not opining on the veracity of another witness. Moreover, the Court noted that any error would be harmless as there was hardly a need for an expert opinion to establish that severe injuries suffered by the victim in that case would be consistent with a sexual assault.

Testimony similar to that of the SAFE nurse in *Brooks* was admitted without objection in this case. As described above, a forensic nurse examiner testified that the results of her physical examination of S could be consistent with abuse that consisted of genital touching. By contrast, unlike the nurse in this case or in *Brooks*, Ms. Drum did not provide any objective data, but rather just stated her conclusion as to whether S was being deceptive.

*Summary*

We are reluctant to abandon the general rule that one witness may not opine on the credibility of another witness' testimony in a case. While the issue arises here in the context of an out-of-court statement of a child witness, the rationale for permitting it could easily apply to in-court testimony and to adult witnesses. Once that door is opened, it is not hard to imagine that the defense will wish to present an opposing expert who discerns signs of fabrication where the prosecution's expert did not. The principle that our system

34

relies on the common sense of jurors to make these difficult credibility judgments will be lost to a battle of experts.

## III

## Conclusion

This was a difficult case for the prosecution. The record shows that the case was prosecuted zealously, as should any case involving an alleged crime against a child, and defended zealously, as our system of justice requires.

It was also evidently a difficult case for a jury. The jury in the first trial could not reach a verdict on any of the charges. The jury in the second trial at first indicated that it was hung, but ultimately reached a guilty verdict on three counts of the indictment, all related to the only incident for which there was evidence other than S's statements – the dream that Mr. Fallin reported to his therapist two years later.

In its effort to support the testimony of its main – and essentially only – witness, the prosecution elicited what amounted to an endorsement of the credibility of an out-of-court statement by that witness that the jury did not see and could not evaluate for itself. It consisted of the expert opinion of Ms. Drum that there were no "signs" – and no need for "concern" – that the out-of-court statement was fabricated or coached. That testimony crossed the line that this Court drew in *Bohnert* and *Hutton*. We must reverse and remand for a new trial.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY AND REMAND THE CASE TO THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID BY CHARLES COUNTY.**

Circuit Court for Charles County
Case No. 08-K-15-000610

Argued: June 1, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 79

September Term, 2017

_____

JASON ADAM FALLIN

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Concurring and Dissenting Opinion by Watts, J., which Getty, J., joins.

_____

Filed: July 12, 2018

Respectfully, I concur that the issue as to expert witness testimony is preserved; I dissent as to the merits. Over the past several years, society has become more aware of the pervasiveness of child sexual assault and abuse. One of the hallmark defenses in child sexual abuse cases is attacking the credibility of the child victim. This case presents the question of whether an expert witness who has evaluated an alleged victim of child sexual abuse may testify as to whether the alleged victim showed specified signs of fabrication or coaching. I would hold that an expert in an appropriate field may testify as to whether he or she saw any signs of fabrication or coaching on the part of an alleged victim of child sexual abuse.

Such testimony is not inconsistent with the prohibition on a witness opining that another witness was credible. This is because such testimony does not constitute an opinion that the alleged victim was sexually abused, or that the alleged victim is testifying truthfully. Where an expert testifies that he or she did not observe any signs of fabrication or coaching on an alleged victim's part, the expert does not offer the opinion that, in fact, the alleged victim is testifying credibly. Instead, the expert simply testifies that he or she did or did not detect any indications of fabrication or coaching. This testimony allows for the determination by the trier of fact that the alleged victim was not testifying credibly, but did not show signs of fabrication or coaching that the expert detected. The expert's testimony does not invade the province of the jury, which remains free to assess the alleged victim's credibility and find whether the defendant sexually abused the alleged victim.

The Majority reasons that "[t]he testimony at issue in this case appears to be indistinguishable from that which this Court found impermissible in" Bohnert v. State, 312

Md. 266, 539 A.2d 657 (1988) and <u>Hutton v. State</u>, 339 Md. 480, 663 A.2d 1289 (1995). Maj. Slip Op. at 31.  I disagree.  <u>Bohnert</u> and <u>Hutton</u> are easily distinguishable.  In <u>Bohnert</u>, 312 Md. at 278-79, 539 A.2d at 663, this Court held that a trial court erred in allowing a social worker to opine that an alleged victim was sexually abused.  In <u>Hutton</u>, 339 Md. at 504-05, 485, 663 A.2d at 1301, 1291, this Court concluded that a trial court erred in allowing a psychologist to testify that an alleged victim had been sexually abused, and in allowing a social worker to testify that child sexual abuse had caused the alleged victim to suffer from post-traumatic stress disorder.  Critically, in <u>Bohnert</u> and <u>Hutton</u>, this Court explained that the testimony was impermissible because it essentially constituted an opinion that the alleged victim was credible.

In contrast to the impermissible testimony in <u>Bohnert</u> and <u>Hutton</u>, an expert's testimony about an alleged victim's lack of signs of fabrication or coaching does not constitute an opinion that the alleged victim was credible, or that the alleged victim was sexually abused.  With the testimony at issue, the expert applies methodology that the expert has been trained to use, and gives an opinion as to whether any signs of fabrication or coaching are present.  The expert would be subject to cross-examination.  Even if believed, an expert's testimony about an alleged victim's lack of signs of fabrication or coaching would not conclusively demonstrate that, in fact, the alleged victim was credible.

As the Majority recognizes, the Court of Special Appeals's holding in <u>Yount v. State</u>, 99 Md. App. 207, 636 A.2d 50, <u>cert. denied</u>, 335 Md. 82, 642 A.2d 193 (1994) is not instructive in this case.  <u>See</u> Maj. Slip Op. at 7-8, 29-30.  In <u>Yount</u>, 99 Md. App. at 218, 210-11, 636 A.2d at 55, 51-52, the Court of Special Appeals held a trial court did not err

in allowing a child therapist to testify that it would be normal for a minor to recant a report of sexual abuse under certain circumstances. This case, of course, does not involve an alleged victim's recantation. In its opinion, the Court of Special Appeals asserted that Yount "clarifies and narrows" Bohnert. Jason Adam Fallin v. State, No. 1083, Sept. Term, 2016, 2017 WL 4570680, at *10 (Md. Ct. Spec. App. Oct. 13, 2017), cert. granted, 457 Md. 396, 178 A.3d 1241 (2018). Clearly, an opinion of the Court of Special Appeals cannot "narrow" an opinion of this Court. More importantly, contrary to the Court of Special Appeals's assertion in this case, in Yount, that Court did not purport to "narrow" this Court's holding in Bohnert. Instead, in Yount, 99 Md. App. at 218, 636 A.2d at 55, the Court of Special Appeals distinguished Bohnert on the ground that, in Yount, the expert did not testify that the alleged victim's version of events should be believed and that the defendant's version should be disbelieved. Bohnert is simply distinguishable here, just as it was distinguishable under Yount's circumstances.

I disagree with the Majority's conclusion that Meredith Drum's "testimony was indistinguishable from that of a person who operates a lie detector and reports the results." Maj. Slip Op. at 33. One of the reasons that lie detector test results are inadmissible is that they essentially constitute credibility determinations. See Bohnert, 312 Md. at 278, 539 A.2d at 663; United States v. Scheffer, 523 U.S. 303, 313-14 (1998). In contrast to a lie detector operator, Drum did not offer a credibility determination; instead, she identified specific signs of fabrication or coaching that she had been trained in her field of expertise to detect, and testified that she did not detect those signs while interviewing S.L.

On a related note, the Majority's discussion of Maryland Rule 5-608 is completely

inapplicable.  See Maj. Slip Op. at 28-29.  Maryland Rule 5-608 does not apply here because it pertains to witnesses who offer lay opinions of other persons' character for truthfulness or untruthfulness.  Drum was neither a character witness nor a lay witness; she was an expert in the fields of child abuse disclosure and clinical counseling in child abuse.  Drum's testimony was subject to Maryland Rule 5-702, which states in pertinent part: "Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue."  Comparing Drum's testimony to the admissibility requirements of Maryland Rule 5-608 is of no utility.

I would follow the lead of courts in other jurisdictions that have held that an expert's testimony about a lack of signs of fabrication or coaching is admissible at a trial on child sexual abuse.  For example, in State v. Wilson, 795 P.2d 336, 343-44 (Kan. 1990), the Supreme Court of Kansas concluded that a trial court did not err in allowing an expert's testimony that certain circumstances—such as "vocabulary, sentence construction, [and] consistency over time"—were "unlikely . . . to happen in a child who's coached." (Emphasis omitted).  In State v. Champagne, 305 P.3d 61, 67 (Mont. 2013), the Supreme Court of Montana determined that a trial court did not err in allowing an expert to testify that she did not detect any indications of coaching while interviewing an alleged victim.  In State v. Baymon, 446 S.E.2d 1, 3-4 (N.C. 1994), where a defendant "attempted to leave the impression that the [alleged] victim had been coached[,]" the Supreme Court of North Carolina held that a trial court did not err in allowing an expert to testify "that she had not picked up on anything to suggest that someone had told the [alleged] victim what to say or

that the [alleged] victim had been coached." In Sampson v. State, 38 N.E.3d 985, 992 (Ind. 2015), the Supreme Court of Indiana held that "testimony about the signs of coaching and whether a child exhibited such signs or has or has not been coached[ is admissible], provided the defendant has opened the door to such testimony" by calling the child's credibility into question. (Footnote omitted). In State v. James W., 866 A.2d 719, 731-32 (Conn. App. 2005), where a defendant attempted to impeach an alleged victim on the ground that she had been coached, the Appellate Court of Connecticut held that a trial court did not abuse its discretion in allowing an expert to testify that she did not observe signs of coaching while interviewing the alleged victim.

I would hold that the Circuit Court for Charles County did not err in allowing Drum—a licensed graduate professional counselor whom the circuit court admitted as an expert in the fields of child abuse disclosure and clinical counseling in child abuse—to testify that she did not see any signs of fabrication or coaching on the part of the alleged victim, S.L. Drum's testimony did not constitute an opinion that S.L. had, in fact, been sexually abused. And, Drum did not testify that she believed S.L., or that S.L. was credible. Drum's testimony did not invade the jury's province, and was wholly consistent with Bohnert and Hutton.

Drum based her testimony on the extended forensic evaluation training that she received at the National Children's Advocacy Center in Alabama. Drum testified that, during that training, she learned about signs of fabrication or coaching. Drum explained that such signs include a child alleging abuse "out of nowhere[,]" "using the exact same phrase repeatedly[,]" and "using developmentally inappropriate language"—i.e., "using

- 5 -

too[-]grown[-]up language[.]" Drum did not render an opinion about S.L.'s credibility; instead, she measured S.L.'s behaviors against specific factors and testified that none of those factors were present. In other cases, the expert's testimony may be the opposite, *i.e.*, that signs of fabrication or coaching are present. Under either circumstance, the ultimate issue of whether child sexual abuse occurred, or whether the witness is credible, remains an issue for the jury to decide.

I fear that the majority opinion deprives juries of admissible evidence regarding the circumstances of an expert's interview of an alleged victim of child sexual abuse, a crime that is all too prevalent and repugnant in our society, and in which the credibility of children is routinely attacked.

For the above reasons, respectfully, I concur and dissent.

Judge Getty has authorized me to state that he joins in this opinion.